[Civ. No. 10120. Second Appellate District, Division One.—June 3, 1935.]

In the Matter of the Estate of WILLIAM WILSON SLOAN, Jr., Deceased. SECURITY–FIRST NATIONAL BANK OF LOS ANGELES (a National Banking Association) et al., Respondents, v. SARAH SLOAN GREEN et al., Appellants.

320

Hill, Morgan & Bledsoe, Benjamin F. Bledsoe and Charles P. McCarthy for Appellants.

O'Melveny, Tuller & Myers, Louis W. Myers, John A. Powell, Jackson W. Chance and Albert Parker for Respondents.

HOUSER, J.—The instant appeal involves several different questions that have arisen on a petition for the distribution of a trust estate.

By a provision in the will of the testator, all the real property of the decedent was devised to Los Angeles Trust and Savings Bank, a corporation, to be held by it in trust for the benefit of the widow of the testator during the lifetime of the former, and upon her death to pay the net income derived from the estate to the son of the testator, William Wilson Sloan, 3d, until he should reach the age of 30 years; at which time the trust was to be terminated and the *corpus* of the trust was to be distributed by a court of competent jurisdiction to said son. The will then provided that if, after the death of the widow of the testator, the said son should die under the age of 30 years—

"said trust fund and any real estate then held by said trustee for this trust shall go to, belong to, vest in and be distributed by a court of competent jurisdiction to the heirs of said William Wilson Sloan 3rd as per his last will and testament."

In the course of events, and following the death of the testator, the trustee entered upon its duties in connection with the administration of the trust; the widow of the testator died; and the real property of the estate was converted into personal property. Some time thereafter, and before he reached the age of 21 years, the son of the testator died, domiciled in the state of Massachusetts, wherein he had executed an instrument that purported to be his last will and testament and by which, in assumed accord with the said power conferred upon him by the provision of the will of his late father, he designated his maternal aunt, Eleanor T. Robinson, as his heir to whom the entire estate of the testator herein was to be distributed. Although respecting its validity, the will of the son apparently was executed in accordance with all legal requirements of the state of California, by the laws of the state of Massachusetts, because of the fact that at the time of the execution of the will the son had not attained the age of 21 years,—in certain probate proceedings in the latter state, instituted with reference to such will, it was ruled not only that said will was not entitled to be admitted to probate, but as well that the petition for the qualified probate of the will for the purpose of establishing the exercise by the son of the power of appointment conferred upon him by the provision contained in the will of the testator

322

herein, should be and it was denied; and each of said orders has become final.

The trustee named in the will of the testator herein having been succeeded by Security-First National Bank of Los Angeles, a corporation, and it having presented to the superior court a petition for an order of distribution of said estate, and respective answers to said petition having been filed in said court not only by said Eleanor T. Robinson, who was the appointee under the purported will of the son of the testator, but as well by two other heirs of said son (the latter being his paternal aunts), and upon the hearing of such petition the said court having made its order in the premises by which it was adjudged that the said Eleanor T. Robinson was entitled to distribution to her of the entire estate of the testator herein, the said two other heirs have appealed from said order or judgment.

As a compelling reason for an order of reversal of the judgment or order made by the superior court, it is urged by the appellants that in the state of California powers of appointment are of no validity, and consequently that the attempted exercise by the son of the testator of the purported power contained in the will of the latter was void and of no legal effect.

In support of such contention the appellants present the argument in substance that, although at one time in the legal history of this state the creation of such a power was expressly authorized by statute (Stats. 1872), long before the will by the testator herein was executed, such statutes had been repealed (Code Amendments, Stats. 1873–74, p. 223); and that at no time since such repeal had other statutes of that character been reenacted;—from which situation (so the appellants assert) the attempted creation by the testator of such a power became a nullity. (Citing particularly *Estate of Fair*, 132 Cal. 523 [60 Pac. 442, 64 Pac. 1000, 84 Am. St. Rep. 70].)

It is undeniable that powers of the nature of that here involved were considered legal as the common law was administered both by the English courts and at least by those of this country which, prior to the Revolution, operated as colonies of the British Government. Whether (in the absence of statute so providing), owing to the origin of ownership of the state of California by the Mexican Government, the

common law in its fullness would exist in this state, is not necessary of consideration (to the contrary, see *Estate of Fair,* 132 Cal. 523, 534 [60 Pac. 442, 64 Pac. 1000, 84 Am. St. Rep. 70] ; 12 Cor. Jur. 200 et seq., and authorities there cited; *Marsters* v. *Lash,* 61 Cal. 622; *Norris* v. *Harris,* 15 Cal. 226) ; for by the terms of section 4468 of the Political Code, adopted in 1872, and based upon the Statutes of 1850, at page 219, it is provided that "the common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of this state, is the rule of decision in all the courts of this state". And by the ruling in the case of *Martin* v. *Superior Court,* 176 Cal. 289, 293 [168 Pac. 135, L. R. A. 1918B, 313], it was declared that the common law embraced "the whole body of common-law jurisprudence as it stood, influenced by statute at the time when the code section was adopted". (See, also, 5 Cal. Jur. 253, and authorities there cited.) Consequently, since the right of power of appointment existed at common law, which right was carried into the law of this state, both by the Statute of 1850, at page 219, and thereafter on the adoption of the code in 1872, by section 4468 of the Political Code (in the assumed absence of any later statute, direct or cognate, by which the exercise of such common-law right is inhibited, or in the absence of some impelling judicial precedent or construction whereby the denial of such right is clearly and concisely indicated), it should follow that unless the effect of the repeal of the statute by which such common-law right was recognized and specially authorized was also to repeal the original common-law right,—such common-law right is still in full force and effect. In that regard and in affirmation of the claimed legislative intent to abolish the use of powers in general, the comment made by the code commissioners in recommending the repeal of the statute, as stated in the concurring opinion in *Estate of Fair,* 132 Cal. 523, 552 [60 Pac. 442, 64 Pac. 1000, 84 Am. St. Rep. 70], was that the "whole chapter on powers (was) wholly unsuited both to the wants and habits of the people, . . . " However, in that connection, and somewhat reflecting upon the propriety of a court in construing a statute to take into consideration evidence of the intention of the legislature, *dehors* the language employed in such statute, it is a rule of construction that if the statute as a whole be unambiguous,

resort to extrinsic evidence of the intention of the legislature in passing the act is improper. So much is clearly indicated by the language employed in the opinion in the case of *McGarrahan* v. *Maxwell*, 28 Cal. 75, 95, wherein the court said:

"We have not felt warranted in resorting to the reports or debates in Congress, upon the passage of the Act of 1862, to ascertain its true meaning and construction, and we adopt the language of Mr. Chief Justice Taney, in *Aldridge* v. *Williams*, 3 How. [9] 24 [11 L. Ed. 469], as clearly expressing the law in this respect. He says: 'In expounding this law, judgment of the Court cannot, in any degree, be influenced by the construction placed upon it by individual members of Congress in the debate which took place on its passage, nor by the motives or reasons assigned by them for supporting or opposing amendments that were offered. The law, as it passed, is the will of the majority of both houses, and the only mode in which that will is spoken is in the Act itself, and we must gather their intention from the language there used, comparing it, when any ambiguity exists, with the laws upon the same subject, and looking, if necessary, to the public history of the time in which it was passed.' (*Leese* v. *Clark*, 20 Cal. [387] 425; *Forrest* v. *Forrest*, 10 Barb. (N. Y.) 46.) The language of the Act is sufficiently plain and unambiguous to indicate the intention of Congress. . . ."

To the same effect, see *Davies* v. *City of Los Angeles*, 86 Cal. 37, 42 [24 Pac. 771].

The language of the repealing statute herein is that "Title Five of Part Two of Division Two, on Powers, of the Civil Code, embracing sections of said code from section eight hundred seventy-eight to nine hundred forty-six, inclusive, is repealed." (Code Amendments, Stats. 1873–74, p. 223, sec. 123.) It is therefore clear that such unambiguous language will not admit of construction. But notwithstanding the authority to which reference just has been had, the author of the opinion proceeds to enlarge somewhat upon the comment asserted to have been made by the code commissioners (*supra*), to the apparent conclusion "that the repeal meant, not the restoration of common-law powers, but a further simplification and advance over even the New York system, by the abolition of many of the powers which that state had

preserved, and the perpetuation of only such as were considered suitable to the simpler wants and habits of the people of this state." (*Estate of Fair*, 132 Cal. 523, 553 [60 Pac. 442, 64 Pac. 1000, 84 Am. St. Rep. 70].) However, from a consideration of the immediately ensuing language of that opinion, it may be somewhat doubtful that even its author had the fullest confidence in the soundness of his own logic; for in his next succeeding statement he says: "*But if it be conceded* that common-law powers in trust *do exist* in this state", etc. But aside from that situation, the apparently well-established exception should be noted to the general rule, to wit, in substance, that the repeal of a statute that abrogates a former act of the legislature, does not have the effect of reviving such former law; or, as declared by section 328 of the Political Code, "No *act* or part of an *act*, repealed by another act of the legislature, is revived by the repeal of the repealing act without express words reviving such repealed act or part of an act." The exception to such rule is concisely stated in 12 Corpus Juris, at page 188, as follows: "The repeal of a statute that is declaratory of a rule of the common law does not necessarily effect the abolition of the common-law rule; but the common law more clearly remains in force for the reason that the statute is an affirmance of it." And that principle has been recognized in part in the case of *Callet* v. *Alioto*, 210 Cal. 65, 68 [290 Pac. 438], where several authorities are cited in its support. With reference thereto, the syllabus epitomizes the decision made by the court as follows:

"The rule that a cause of action or remedy dependent upon a statute falls with a repeal of the statute, does not apply to an existing right of action which has accrued to a person under the common law, as in such case the cause of action is a vested property right which may not be impaired by legislation."

In the case of *Ventura County* v. *Clay*, 112 Cal. 65 [44 Pac. 488], it was held that the repeal of a statutory provision which was the same in substance as another statutory provision previously enacted did not affect the operation of the latter. (23 Cal. Jur. 714.)

The case of *Reeves & Co.* v. *Russell*, (1914) 28 N. D. 265 [148 N. W. 654, L. R. A. 1915D, 1149], is in point. In reliance upon supporting authorities therefor, and in consequence of

extended reasoning that embraced a careful consideration of pertinent California statutes and authorities, including section 20 of the Civil Code, it is ruled that (syllabus):

"Where a statute either declaratory of or changing the common law is repealed without express provision against the revivor of the common law, the common law is *ipso facto* revived by such repeal, which repeal will be regarded in the absence of a contrary legislative intent appearing as an affirmance of the common law, reviving the same."

In addition thereto and as apparently applicable to the situation with respect to the effect of the repeal of a statute that in substance is in recognition or declaratory of a rule of common law theretofore in existence, the provisions of section 20 of the Civil Code (enacted in 1872 and identical with sec. 18, Code Civ. Proc. and sec. 18, Pol. Code) should be given consideration. It is there provided that:

"No statute, law, or rule is continued in force because it is consistent with the provisions of this code on the same subject; but in all cases provided for by this code, all statutes, laws, and rules heretofore in force in this state, whether consistent or not with the provisions of this code, unless expressly continued in force by it, are repealed or abrogated. . . ."

It would therefore seem that, unless it be true that by a proper construction of the broad language of such statute its application should be limited to former existing statutes, as distinguished from common law and its rules; and in consequence, it be indicated that the real' purpose of the legislation was to eliminate from our rules of civil conduct the force and effect of any pre-existing Mexican "statute, law, or rule" of whatever origin or nature, by which, prior to the acquisition from the Mexican Republic of the territory of which the state of California is now a part, the people of this state were bound; or unless the apparently plain language employed in section 20 of the Civil Code is to be considered as modified by other cognate statutes;—it should be obvious that, although "consistent with the provisions of this code" the common law and its rules with respect to the right to delegate or to create a power were not "continued in force"; but that "whether *consistent* or not with the provisions of this code", such common law and its rules, "unless

expressly continued in force . . . (were) repealed or abrogated.''

It may be noted that nowhere within the statutes of this state may be found a direct declaration either that the common law, or any of its rules are either expressly or at all continued in force; also, that in connection with the provisions of section 20 of the Civil Code, as impliedly indicating a contrary intention on the part of the legislature, by the provisions of section 19 of the Political Code (sec. 23, Penal Code), which immediately follows section 18 of the Political Code (identical with sec. 20 of the Civil Code), many different then-existing statutes are either distinctly specified or identified as ''continuing in force, notwithstanding the provisions of the codes, . . . '' But no reference is had therein to powers generally, or in particular to powers of appointment. However, in that regard, and as indicating an impelling influence in the judicial construction that impliedly has been placed upon the provisions of section 20 of the Civil Code, to the effect that when not inconsistent with or repugnant to a statute the common law is ''the rule of decision'' in this state, attention should be directed to the language employed in section 5 of the Civil Code, as well as in section 4468 of the Political Code. The former statute provides that:

''The provisions of this code, *so far as they are substantially the same* as existing statutes *or the common law,* must be construed as *continuations* thereof, and not as new enactments.''

As hereinbefore has been set forth, section 4468 of the Political Code contains the declaration that ''the common law of England, so far as it is not repugnant to or inconsistent with the constitution of the United States, or the constitution or laws of this state, *is the rule of decision* in all the courts of this state.''

From an examination of the language employed in the said several statutes it may be noted that, although by section 20 of the Civil Code it is provided not only that ''no statute, law, or rule is continued in force because it is consistent with the provisions of this code'', but that ''unless expressly continued in force'' it is ''repealed or abrogated'',—by the terms of section 5 of the Civil Code, in substance it is declared that statutes that are ''*substantially the same* as

. . . common law . . . must be construed as *continuations* thereof''. And in the case of *Churchill* v. *Pacific Improvement Co.,* 96 Cal. 490, 493 [31 Pac. 560], it was held that the word "construed", as used in section 5 of the Civil Code, should carry the meaning generally accorded to the word "regarded" or "considered". So that by the provisions of the one statute, simply because a rule of common law is consistent with a statute does not mean that it is continued in force; but that if that is its sole virtue, it is repealed; whereas, by the provisions of the other statute, if the preexisting common law "is substantially the same" as a new statute, the latter is to be considered, not "as a new enactment", but is to be regarded as a continuation of the former. It therefore becomes obvious that, as far as concerns common law or rules that are consistent with existing statutes, the respective provisions of the two sections of the Civil Code to which reference has been had are somewhat in conflict one with the other. In such situation, the language of section 4468 of the Political Code may be helpful. In effect, as hereinbefore has been set forth, it provides that if the common law is neither repugnant to nor *inconsistent* with the written law, the common law "is the rule of decision". But manifestly, if the common law were either repugnant to or inconsistent with a statute, even in the absence of statutory provision to that effect, the latter would prevail. In other words, in order to be "the rule of decision", the common law must be *consistent* with the constitution or the statutory provision. But if a common-law rule, sometimes somewhat variable and vague, and to that extent precisely indeterminable, especially if drawn from *lex non scripta,* is to be regarded as "the rule of decision" when, and only when, it is *"consistent"* with the statute, it must be that (according to the letter of the statute) the words of the statute are then superseded by the common-law rule, even though the provisions of the statute be plain, certain and unambiguous, nor suffering from any of the common infirmities that attach to an unwritten law. Otherwise stated, if *inconsistent* with the statute, the common law is of no effect; but if *consistent* with the statute to the extent that it is in exact conformity or in substantial harmony therewith, the common law overrules the statute and becomes "the rule of decision". Without meaning to challenge the power of

the legislature in the premises to enact such a law, nevertheless it is most apparent that such a result of its act, if not an absurdity, at least would be wholly at variance with the otherwise well-established rule that in such conditions the statute takes precedence and becomes "the rule of decision". However, if by being "consistent" is meant (as the statute might seem to indicate) "not repugnant to or inconsistent with" the *essential* provisions of the statute,—thus permitting the existence or the operation of common law minor, additional, or comparatively unimportant substantive law or procedure with reference thereto,—the statutory provision that the common law, thus limited, shall be "the rule of decision in all the courts of this state" may not be so inharmonious with common legal understanding of the force and effect ordinarily attributable to statute law. On the other hand, if (as is present in the instant matter) one may assume the existence of a state of facts to which no statutory rule were in anywise applicable, it would then be possible to give full force to the declaration that "the common law . . . is the rule of decision"; for in that situation the common law would be neither "repugnant to nor inconsistent with" either constitutional or statutory provision. Nor, because of the nonexistence of any written law on the subject, would the common law thereon be "consistent with the provisions of this code". To be either consistent, or inconsistent, with the provisions of the code presupposes the existence of some particular code provision as to which such consistency or inconsistency may relate. Hence, with reference to the particular situation regarding and affecting which it was proposed to apply the common law (there being no code provision thereon), no conflict would be present with reference to the terms of section 20 of the Civil Code by which it is provided that "all statutes, laws, and rules, . . . whether consistent or not with the provisions of this code", are repealed or abrogated. Furthermore, as is concisely stated in 12 Corpus Juris, at page 202, "it will not be presumed that the common law was repealed by a statutory or a constitutional provision unless the language naturally and necessarily leads to that conclusion." (See, also, vol. 5, Am. Dig., Dec. Ed., p. 460 et seq.) Moreover, by judicial construction, as is evidenced by numerous authorities cited in 5 California Jurisprudence, at page 255 et seq., particularly including

*In re Elizalde's Estate,* 182 Cal. 427 [188 Pac. 560], and *Martin* v. *Superior Court,* 176 Cal. 289 [168 Pac. 135, L. R. A. 1918B, 313], ''the common law is the rule of decision in all the courts of California''. But that ''the rule of decision'' does not include ''the civil law, nor the 'ancient common law' of the civilians, nor the Mexican law'', see *Lux* v. *Haggin,* 69 Cal. 255, 379, 384 [4 Pac. 919, 10 Pac. 674]. However, notwithstanding the difficulty that may arise from what may be considered a paradoxical situation, it substantially appears from the provisions of section 5 of the Civil Code, as well as from those provisions of section 4468 of the Political Code to which attention hereinbefore has been directed, that the language of section 20 of the Civil Code does not include ''consistent'' common law or its rules among those ''laws or rules'' which are ''repealed or abrogated''.

In addition thereto, an examination of the provisions of sections 715, 716 and 772 of the Civil Code, which were enacted in 1872 and which in 1874 were in effect at the time when the statute that recognized the existence of the common-law rule with reference to the right to create a power of appointment, was repealed, it becomes evident that in effecting such repeal the legislature had no intention of abrogating the prior and then existing common-law rule that related to the right to create a power of appointment; because each of such statutes, which then, and which ever since have been, in force, was devoted and related to some sort of restraint or limitation upon the recognized right of the power to suspend the alienation of property. Besides, as more clearly indicating a lack of intention on the part of the legislature to repeal or to disturb such pre-existing common-law rule with respect particularly to powers of appointment, it may be observed that section 781 of the Civil Code then and ever since has provided that:

''A general or special *power of appointment* does not prevent the vesting of a future estate limited to take effect in case such power is not executed.''

Likewise, former sections 1330 and 1331 of the Civil Code, which were enacted in 1872 and thus remained intact until combined in one statute and re-enacted in 1931 as section 125 of the Probate Code, are declarative of what property shall be deemed passed by devise ''of all the testator's real or personal property''. And it is there further provided that such

a bequest or devise shall include "property embraced *in a power to devise*". Again, former section 900 of the Civil Code was enacted in 1872, but was repealed in 1874 at the same time and by the same act that the general statute here in question was repealed; but it was immediately re-enacted as section 860; and from that time until the present is still the statutory law with reference to the subject to which it relates. Like the other statutes to which attention hereinbefore has been directed, it contained, and now contains, a reference to powers which apparently is broad enough to include a power of appointment. It is as follows:

"Where a *power* is vested in several persons, all must unite in its execution; but, in case any one or more of them is dead, the power may be executed by the survivor or survivors, unless otherwise prescribed by the terms of the power."

Not suggested as being of more than persuasive force, but as affording some indication of common understanding of the state of the law not only by the laity and the lawyers, but by the courts as well, it may be noted that in this state at all times since the enactment of the repealing statute here in question, the exercise of the assumed right of power of appointment has been in general use, with the inevitable result that in many cases the courts of this state have been required to render, and have rendered, decisions that have involved some questions regarding the use of such a power; and that in none of such adjudications has the legality of the power of appointment been either expressly or impliedly denied. To the contrary, although possibly referred to as an "open question" in each of several of such cases, the validity of the exercise of such power is assumed or taken for granted. (See *Elmer* v. *Gray*, 73 Cal. 283 [14 Pac. 862]; *Estate of Dunphy*, 147 Cal. 95 [81 Pac. 315]; *Gray* v. *Union Trust Co.*, 171 Cal. 637 [154 Pac. 306]; *Todd* v. *Superior Court*, 181 Cal. 406 [184 Pac. 684, 7 A. L. R. 938]; *Estate of Murphy*, 182 Cal. 740 [190 Pac. 46]; *Estate of Bowditch*, 189 Cal. 377 [208 Pac. 282, 23 A. L. R. 735].)

Furthermore, as a certain indication of additional recognition by the legislature of this state of the existence of such right, it may also be noted that the California Inheritance Tax Act (Stats. 1921, p. 1500, sec. 2, subd. 6) contains the provision that "whenever any person . . . *shall exercise a*

*power of appointment* . . . such appointment, when made, shall be deemed a transfer taxable under the provisions of this act,'' etc.

From a consideration of the foregoing, the conclusion follows that the repeal of the statute by which the preexisting common-law right to make a power of appointment was declared had no effect upon such right other than to work a revival of it, or one might say, a restoration of its natural parentage; and since it has not been suggested that the common-law right is either repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of this state,—as is said in the case of *McDaniel* v. *Cummings*, 83 Cal. 515, 518 [23 Pac. 795, 8 L. R. A. 575], it is manifest that the whole question is solved whenever it is determined what the common-law rule is.

█ According to English decisions, dating from as early as 1707, in order that a power of appointment may be validly exercised by means of a will of a donee of such power, it is necessary that in its formal execution, the will of such donee be valid. So held in *Attorney-General* v. *Barnes*, 2 Vern. 597, 23 English Reports (Full Reprint), 990, where, although the codicil of a will was properly witnessed, the original will was not. The same ruling where the will was witnessed by only two persons,—the statute requiring three. (*Wagstaff* v. *Wagstaff*, 2 P. Wms. 258, 24 Eng. Repts. [Full Reprint] 721.) Likewise, where the requirement was that the will, or any writing purporting to be the will, of the donee be ''under hand and seal'', and it appeared that as to the will of the donee his seal had been omitted. (*Dormer* v. *Thurland*, 2 P. Wms. 506, 24 Eng. Repts. [Full Reprint] 837.) Also, going further, in *Hodsden* v. *Lloyd*, 2 Brown C. C. 535, 29 English Reports (Full Reprint), 293, where it was held that because a woman who was the donee of a power had married after she had made her will, by means of which will such power was attempted to be exercised, the appointment was illegal. To the same effect, see the numerous cases digested in note under the title ''Validity of Donee's Will'', in 64 Lawyers' Reports Annotated, 892 et seq., which decisions were dependent upon different respective circumstances that affected the validity of the will, many of which being equally technical or drastic as were the respective facts hereinbefore set forth. Perhaps as contrary to the weight of

authority, as hereinafter set forth, in the course of reasoning upon a question that related to the legal effect in one state of the order by which the will of the donee of the power was admitted to probate in another state, in the case of *Thrasher* v. *Ballard,* 33 W. Va. 285 [10 S. E. 411, 412, 25 Am. St. Rep. 894], in substance the court made the broad declaration that if a power is to be exercised by means of a will, it is necessary that the will be made ''as the law requires it to be made; so made as, under our statute, that it would be effectual to pass the trustee's own property''.

In the instant matter, as hereinbefore has been stated, at the date when the donee of the power of appointment executed his will in the state of Massachusetts, wherein he was domiciled, and in said will attempted to exercise such power of appointment, he lacked but thirty-two days of being twenty-one years of age. It appears that by the laws of the state of Massachusetts, because of the fact that at the time when the donee of the power executed his said will he was not of the age of twenty-one years or over, he was disqualified from making a valid will. But by the terms of section 1270 of the Civil Code of this state, which was in force at the time in question, it was provided that ''every person over the age of eighteen years, of sound mind, may, by last will, dispose of all his estate, real and personal'', etc. (See, also, Probate Code, sec. 20.) In no respect other than that the donee of the power was lacking in statutory age for the purpose of making a will does it appear that his will was not executed in full accordance with legal requirements of the state of Massachusetts. It therefore becomes apparent that one of the principal points that should be, and is, raised by the instant appeal is whether, in this state, the legality of the exercise of the power of appointment by the donee thereof is to be determined with reference to the laws of Massachusetts relating to the age qualification of the donee of the power in the execution of his will, or whether the question of the legality of the will of such donee, as it affects the exercise of such power, is to be determined on the basis of the provisions of section 1270 of the Civil Code, now included in section 20 of the Probate Code of this state.

It is a general rule, supported by the weight of authority with reference thereto, that the question of the validity of a will, at least as far as it purports to affect the dis-

position of personal property, is determinable by the law of the state that is the domicile of the testator. And it is also a well-established principle of law that the fact that by such an instrument the testator seeks to exercise a power of appointment has no effect upon the question of whether, according to the laws of the state or sovereignty wherein the instrument purportedly is executed and in which the testator is domiciled, it constitutes a valid will, as distinguished from a valid exercise of the power of appointment.

In the case of *D'Huart* v. *Harkness,* 34 Beav. 324, 55 English Reports (Full Reprint), 660 (not strictly in point), the facts and the ruling thereon are indicated by the syllabus thereof, as follows:

"Personal property was held, under an English will, in trust for such person as an English lady should, by her last will in writing duly executed, appoint. She afterwards married a Frenchman, and died domiciled in France, having appointed the property by an unattested will, valid according to the law of her domicil, and admitted to probate in this country: Held, that this will was a valid execution of the power."

See, also, to the same effect, *In re Price,* 69 L. J. C. H. (N. S.) 225 (1900, 1 Ch. 442). Of course, what the ruling would have been had the will been invalid according to French law, but valid according to English law, is not disclosed in either of such cases. However, although considered solely as a will, the instrument may lack validity in the place of the domicile of the testator, and consequently be ineffectual for the purpose of serving as a foundation for title, nevertheless, even though the exercise of the power to make an appointment be limited or restricted to the execution by the donee of such power by a will (which presumably must be a valid will),—it would seem to be an established rule that, as far as the exercise of such a power of appointment is concerned, although according to the laws of the domicile of the donee of such power, neither the will, nor the exercise of such power by means of a will, be valid,—if such will be executed in accordance with the law existing in the state or sovereignty of the donor of the power, and the subject-matter of the power be personalty located within the jurisdiction wherein the power was created, it would be entitled to be admitted to probate "as a will for the purpose of the appointment, though

it may not be admissible for other purposes''. (*Murphy* v. *Deichler*, (1909) L. R. App. Cas. [House of Lords] 446.)

In the case of *Tatnall* v. *Hankey*, (1838) 2 Moore P. C. 342, 12 English Reports (Full Reprint); 1036, it was held that a will made in Paris in accordance with English law requirements by a woman who afterwards became domiciled in Naples, where she died, and by which will she exercised a power of appointment, was valid in England where the subject of the power (personal property) was located, even though according to Neapolitan law both the will and the power were invalid. And that principle was followed in *Barnes* v. *Vincent*, 5 Moore P. C. 201, 13 Eng. Repts. (Full Reprint) 468; *In re Sophia Alexander*, (1860) 8 W. D. 451 [29 L. J. (P. & M.) 93]; *Goods of Hallyburton*, (1866) L. R. 1 P. & M. 90; *Goods of Huber*, (1896) L. R. Prob. Div. 209; *Pouey* v. *Hordern*, (1900) L. R. 1 Ch. Div., 492.

In the case of *Murphy* v. *Deichler*, (1909) L. R. App. Cas. [House of Lords], Appeal Cases, 446, it appeared that an English woman, who was the donee of a power of appointment, married a German and thereafter became a naturalized German subject, with a German domicile. While so domiciled and within German territory, she exercised her power of appointment by a will duly attested according to the laws of England, but invalid by German law. Pursuant to trial, an order was made ''that the executors and trustees should be at liberty to apply for a grant of letters of administration with the alleged will and codicil annexed, limited to the estate and interest of the testatrix in the property over which she had a power of appointment.'' Lord Loreburn, L. C., delivered an opinion with reference thereto as follows:

''My Lords, the learned counsel for the appellant have urged all the arguments which could have been urged in support of the appeal, and I think they have perhaps shewn that seventy years ago their arguments might possibly have prevailed. But it has been established, I think not unreasonably, that it is a proper exercise of an English power of appointment by will if it be exercised by a will in the English form, even though the person appointing be domiciled abroad and the will be not validly executed according to the law of domicil. The document may be admitted to probate as a will for the purpose of the appointment, though it may not be admissible for other purposes.

"I think this case falls within the rule that it is not necessary or advisable to disturb a fixed practice which has been long observed in regard to the disposition of property, even though it may have been disapproved at times by individual judges, where no real point of principle has been violated.

"Under these circumstances I think your Lordships will be well advised to adhere to the decision of the Court of Appeal in Ireland."

In 49 Corpus Juris, at page 1287, the following statement of the law is made:

"A power to be exercised by an instrument in the nature of, or purporting to be, a will is well exercised by an instrument of a testamentary character, although it is void as a will; . . . "

In treating the same subject, in 21 Ruling Case Law, at page 794, it is said:

"So far as the sufficiency of the execution of a power relating to personal property given by will is concerned it seems to be settled that the law of the domicil of the donor, and not of the donee or of the place where it is executed, controls."

And in similar situations the American cases have indicated that the principle so concisely announced in *Murphy* v. *Deichler, supra,* to which reference hereinbefore has been had, should prevail.

In the case of *Sewall* v. *Wilmer,* (1882) 132 Mass. 131, it was held that the will of a married woman, who was the donee of a power of appointment, and by which will she exercised such power, was valid in Massachusetts, which was the domicile of the donor of the power (and the situs of the property involved), even though the will of the donee of the power was executed in the state of Maryland, where the donee was domiciled and where she died, and in which state the execution of the power of appointment was invalid.

In the case entitled *In re New York Life Ins. & Tr. Co.,* 139 N. Y. Supp. 695, 706 (affirmed in 209 N. Y. 585 [103 N. E. 315]), it was held that, although domiciled in Italy at the time of her death, the will of a woman by which she exercised a power of appointment as to property located in New York was valid as to the exercise of such power, not-

withstanding the fact that by the law of Italy, in that regard, the will was invalid.

In principle, to the same effect, see *Cotting* v. *De Sartiges,* 17 R. I. 668 [24 Atl. 530, 16 L. R. A. 367] ; *Rhode Island H. T. Co.* v. *Dunnell,* 34 R. I. 394 [83 Atl. 858, Ann. Cas. 1914D, 580] ; *Lane* v. *Lane,* 4 Penne. (20 Del.) 368 [55 Atl. 184, 103 Am. St. Rep. 122, 64 L. R. A. 849].

With respect to the point that in circumstances such as are present in the instant case, the law of the domicile of the donor of a power of appointment controls as to the question of the validity of the exercise of such power, the opinion in the case entitled *Estate of Bowditch,* (1922) 189 Cal. 377 [208 Pac. 282, 23 A. L. R. 735], contains several declarations as to the law that are particularly applicable herein. In that case the donor of the power was domiciled in Massachusetts, but at the time of her death the donee thereof was domiciled in the state of California;—which situation, as it relates to the respective domiciles of the donor and the donee, is exactly the opposite of that which obtains in the instant matter. On appeal from the order or judgment rendered therein by the lower court, the Supreme Court of this state said in part that "the ultimate question, therefore, is whether the will of Charlotte Bowditch (the donee, who was domiciled in California), in so far as the exercise of this power of appointment is concerned, is governed by the laws of California." It was decided that the laws of the state of *Massachusetts* were controlling. The following excerpts may be noted:

"It is obvious that the exercise of the power of appointment in the will of Charlotte Bowditch (the donee) is governed by and dependent upon the laws of California *only in the event that the personal property which is the subject of the said power is within the jurisdiction of this state.* As previously stated, the personal property herein involved is not actually within the state of California. Neither is it constructively within this state, under the doctrine of *mobilia sequuntur personam.* 'That maxim (*mobilia sequuntur personam*), universally applied in the jurisdiction of all civilized nations, is that the personal estate of a decedent, wherever it may in fact be located, is, for the purposes of succession and distribution, deemed to have no other locality than the domicile of the decedent.' (Citing cases.) But personal prop-

erty which is the subject of a power of appointment does not acquire a constructive situs in the state of the domicile of the donee of the said power under this theory, for such property is no part of the estate of the donee. . . .

"It would be entirely competent for the state of Massachusetts to authorize a transfer of the property in accordance with an appointment *in a will invalid under the laws of California.* (*Sewall* v. *Wilmer,* 132 Mass. 131.)"

Quoting from the brief of respondent herein: "To paraphrase the words of the court, quoted above, on a converse state of facts (such as is presented by the record herein), it would be entirely competent in the *state of California* to authorize a transfer of the property in accordance with an appointment in a will *invalid under the laws of Massachusetts.*"

In support of the contention made by the appellants herein to the effect that "the alleged will of the donee, . . . cannot be relied on as an exercise of the purported appointment because it has not been admitted to probate", it is noted that in the case of *Castro* v. *Richardson,* (1861) 18 Cal. 478, the principle is enunciated that a will cannot be given in evidence as the foundation of a right or title unless it has been duly probated. Also, that in *Estate of Patterson,* 155 Cal. 626, 636 [102 Pac. 941, 132 Am. St. Rep. 116, 18 Ann. Cas. 625, 26 L. R. A. (N. S.) 654] (and perhaps in *McDaniel* v. *Pattison,* 98 Cal. 86 [27 Pac. 651, 32 Pac. 805]), the same general thought is expressed. Nevertheless, in each of the later cases of *Estate of Johnston,* (1922) 188 Cal. 336 [206 Pac. 628], and *Estate of Bassett,* (1925) 196 Cal. 576 [238 Pac. 666], a ruling was made which at least is out of harmony with the decision in the case first cited in this paragraph. In the Johnston case, in reliance upon a ruling made in *Estate of Thompson,* 185 Cal. 763 [198 Pac. 795], it was held that, without first proving that a will had been admitted to probate, its execution might be shown (by one witness, instead of as ordinarily by two, as required on proof of the execution of a will), for the purpose of establishing the existence therein of a provision by which all former wills made by the testator were revoked. And in the Bassett case the same rule was invoked for the purpose of establishing the fact in the same manner that the will in question contained provisions

that were "wholly inconsistent with the terms of a former will".

It is therefore concluded that, although by the laws of the state of Massachusetts neither the will nor the purported exercise of the power of appointment may have been valid,—by the laws of the state of California, even conceding (without deciding) that the will itself was invalid, the provisions thereof with reference to the exercise of the power of appointment were provable in this state.

If it may be assumed that the conclusions hereinbefore indicated are correct, the next essential question that is presented for the consideration of this court relates to the proper effect that should be given to the appointment as exercised by the donee thereof. In that connection, naturally one of the most important factors is the foundational or creative language of the power as used by its donor,—its pertinent direction being that if the donee thereof should die before reaching the age of thirty years, the trust fund "shall go to, belong to, vest in, . . . the heirs of said . . . (donee) as per his last will and testament."

As hereinbefore has been set forth, the donee died even before he attained the age of twenty-one years. Nevertheless, he left a purported will by the terms of which he appointed one of his heirs as the person to whom such trust fund "shall go to, belong to, vest in", etc. He left other "heirs" who, by his failure to provide for them in his will, were effectually excluded or omitted from any appointment under the power of which he was the donee. In such circumstances, it is contended by the appellants herein that the attempted exercise by the donee of the power of appointment was invalid, in that by the language employed by the donor of the power, the donee thereof was limited and restricted to a distribution of the trust fund to his *"heirs";* whereas he selected and appointed but one of such heirs, to the exclusion of all the other of his heirs.

At the time that the power was created, it well may be that the donor thereof was aware of and had in mind the fact that should the donee of the power survive for any considerable time, the personnel of his "heirs" might change from time to time. For example, dying at the time he did, the donee left surviving as his "heirs" at least both the appellants and the respondent herein; but had he lived until just

before he reached the age of thirty years, and in the meantime some of his former "heirs" had died, or had the donee married and his wife had given birth to children who survived their father, it is obvious that the personnel of the class who might have become entitled to a distribution of the assets of his estate, if any, would have varied, just as the circumstances to which reference has been had changed from time to time. Hence, it may have been deemed advisable, if not necessary, that general words of description should be employed that would meet and be adaptable to changed circumstances, and fittingly provide for those individuals who, in accordance with the laws of succession, on the death of the donee of the power, might or would become entitled to inherit his estate and to a distribution thereof. It would therefore seem clear that by the use of the word "heirs", in creating the power of appointment, and in thus indicating the persons who ultimately might or would become the recipients of his bounty, the donor of such power used a word that was general in its nature, but which at the same time was accurately descriptive; in other words, a class was designated. In such circumstances, the law is fairly well established that in the absence of controlling statute to the contrary, in exercising the power of appointment, no member of a class designated by the donor of the power may be entirely excluded by the donee of the power from at least a substantial participation in the distribution of the trust fund or estate. In volume 21, Ruling Case Law, page 806, where various references are cited in support of the rule there announced, it is said:

"At common law if the donor of a power of appointment by will has, in the instrument creating the power, designated a class of persons among whom the subject of the power is to be appointed, the provisions of a will which excludes any of the class will not be a valid execution of the power."

And in 49 Corpus Juris, pages 1265, 1266, the rule is thus stated:

"A power of appointment is non-exclusive when no right of selection among the objects or of exclusion of any of them is given to the donee. So, under a power containing no words of exclusion, the property must be so distributed, if the power is exercised, that all the objects shall have some portion of it, and the exclusion of any member of the desig-

nated class in making the appointments invalidates the attempted exercise of the power.''

And see extensive note with digest of pertinent authorities in Lawyers' Reports Annotated, 1916D, page 505.

Among the numerous precedents, the following are noted: The power to appoint ''children'', or ''issue'', respectively, is not validly exercised where one child is omitted from the class (*White* v. *Wilson*, (1853) 22 L. J. Eq. (N. S.) 62; *Stolworthy* v. *Sancroft*, (1864) 33 L. J. Eq. (N. S.) 709; *Faloon* v. *Flannery*, 74 Minn. 38 [76 N. W. 954]; *Thrasher* v. *Ballard*, 35 W. Va. 524 [14 S. E. 232]; *Morris* v. *Owen*, 2 Call (Va.), 520); or when ''children and grandchildren'' are designated in the power, none may be omitted from the appointment (*Wright* v. *Wright*, 41 N. J. Eq. 382 [4 Atl. 855]); where the power specifies ''grandchildren'', all must receive. (*Cameron* v. *Crowley*, 72 N. J. Eq. 681 [65 Atl. 875].)

In accordance with weight of authority, the conclusion as to the nonexclusiveness of the power herein would seem to be clearly indicated;—hence, that such power was invalidly exercised.

Incidentally, the appellants urge the point that ''the language of the power of appointment is precatory and not mandatory and, upon the failure of the donee to exercise it in a valid manner, the trust property remained part of the estate of the donor and descends to his heirs''.

As has been announced in numerous decisions, the word ''precatory'' is properly applied to an expression by a trustor wherein a hope, a wish, a desire, a recommendation, or a request is indicated by him. Necessarily the words by which a precatory trust is created constitute an entreaty; and is beseeching, or suppliant, or prayerful in its nature. (*Bohon* v. *Barrett's Exr.*, 79 Ky. 378; *Hunt* v. *Hunt*, 18 Wash. 14 [50 Pac. 578].) And although by the earlier cases the doctrine of precatory trusts was carried to a great length, by the later authorities the decisions in that regard are much relaxed.

In *Igo* v. *Irvine*, 139 Ky. 634 [70 S. W. 836], it was held that ''where testator devised certain land to his son, absolutely, a subsequent provision by which testator requested all of his children, if any should die without issue, at their death to will the property received from his estate to testator's surviving children, or the issue of those dead, the devise

was insufficient to raise a 'precatory trust' and limit the fee previously devised''.

In the case of *Holmes* v. *Dalley*, 192 Mass. 451 [78 N. E. 513], where it was stated in the will of a testator that after the death of his wife one-half of the property of the trust fund should be paid to the wife's appointee, but that it was the wish and desire of the testator that the wife should make such appointment to the daughter of the testator and to her children, it was held that the words ''wish and desire'' contained in the will did not create what is commonly called a precatory trust, but was merely an expression of hope and belief of the testator.

Also, in *Trustees of Hillsdale College* v. *Wood*, 145 Mich. 257 [108 N. W. 675], where the declarations in the will were to the effect that it was the testator's request that upon the death of his wife, to whom the property had been specifically devised, she provide for testator's legatees as indicated in his will, it was held that such words did not create a precatory trust.

Considering the language employed by the donor of the power in the instant matter, even by viewing it in the light of the most auspicious authorities to which the attention of this court has been directed, it is impossible to give to such language a construction which would admit of a conclusion favorable to the suggestion made by appellants to the effect that it is precatory in character. The donor's required disposition of his estate was plain, direct and conclusive. It constituted not an entreaty, nor a wish, a desire, a request, a recommendation, or anything of that sort. It is most apparent that the power created by its donor was mandatory.

It becomes unnecessary to consider other points presented by appellants.

It is ordered that the judgment or order be and it is reversed; and that regarding the questions involved in this appeal such proceedings only be had in the lower court that, after a determination by it of the names of the persons who, in accordance with the decision herein, are entitled to distribution of the estate as heirs of the donee of the power, an order be entered by which such persons, or their respective representatives, will share in the assets of said estate in accordance with their respective rights as such heirs.

Conrey, P. J., concurred.

YORK, J., Dissenting.—I dissent. I am in accord with the foregoing opinion with the exception only of that portion which holds that the provision in the will of William Wilson Sloan, Jr., reading: "to the heirs of said William Wilson Sloan, Third, as per his last will and testament", means that the said William Wilson Sloan, Third, had to leave to *each* and every one of his heirs a portion to be designated by William Wilson Sloan, Third. It is my opinion, in the absence of any direct California authority, that this provision of the will merely meant that the said deceased was limited in disposing of the property involved to a person or persons to be designated by him, but who *must* be his *heir* or *heirs,* and that he was *excluded* from disposing of any of the property to any person, who was *not* his heir. Therefore, I believe that the judgment of the trial court should be affirmed.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 1, 1935.